89 N.Y.2d 506 (1997)
678 N.E.2d 474
655 N.Y.S.2d 862
In the Matter of New York County DES Litigation.
Susan Wetherill, Respondent,
v.
Eli Lilly & Company et al., Defendants, and Emons Industries, Inc., Appellant.
Court of Appeals of the State of New York.
Argued January 6, 1997
Decided February 11, 1997.
Anderson Kill & Olick, P. C., New York City (Jeffrey L. Glatzer and Eric D. Statman of counsel), for appellant.
Ronald R. Benjamin, Binghamton, for respondent.
Herzfeld & Rubin, P. C., New York City (Michael Hoenig, David B. Hamm and Linda M. Brown of counsel), and Hugh F. Young, Jr., of the Virginia Bar, admitted pro hac vice, for Product Liability Advisory Council, Inc., amicus curiae.
Chief Judge KAYE and Judges LEVINE, CIPARICK and WESLEY concur with Judge TITONE; Judge SMITH dissents and votes to affirm in a separate opinion; Judge BELLACOSA taking no part.
*508 TITONE, J.
CPLR 214-c (2) provides that the time for initiating a cause *509 of action for damages resulting from exposure to a harmful substance begins to run from the date that the "injury" was discovered or could have been discovered with reasonable diligence. The specific issue before us in this appeal is whether an "injury" is discovered within the meaning of CPLR 214-c (2) when the symptoms become apparent or instead when the connection between those symptoms and the injured's exposure to a toxic substance is recognized. We hold that the time for bringing the action begins to run under the statute when the injured party discovers the primary condition on which the claim is based.
According to the papers submitted on the motion for summary judgment, plaintiff Susan Wetherill was treated in 1978 or 1979 for dysplasia, a diagnosis indicating a "pre-cancerous" condition in her cervix. Thereafter, plaintiff had a series of reproductive difficulties, suffering four successive miscarriages in 1980 or 1981, 1984, early 1986 and late 1986. In 1987, after having sought help identifying the reasons for her repeated miscarriages, plaintiff was advised that she had a T-shaped uterus, and she underwent surgery for the removal of adhesions and a uterine septum. Less than a year later, plaintiff delivered a preterm baby after 24 weeks of gestation, but the infant did not survive. Several months after this delivery, plaintiff was advised that she had an "incompetent" cervix. She was subsequently treated for this condition.
Plaintiff testified at her deposition that it was not until shortly after her 1988 preterm delivery that she first learned that her mother may have taken a harmful drug during her own pregnancies that could have affected her daughters' reproductive health. Plaintiff had not previously heard about diethylstilbestrol (DES), the drug that is now known to cause abnormalities and pathological conditions in some of its users' female offspring (see, Hymowitz v Lilly & Co., 73 N.Y.2d 487, 502-503). According to her deposition testimony, plaintiff first learned about DES and the possibility that her mother had ingested it during a telephone conversation with her sister that took place in or about March of 1988. Plaintiff's sister was unable to state with certainty that her mother had taken DES because her own efforts to locate the medical records had been unsuccessful. Plaintiff did not immediately pursue the matter by asking her mother directly about the drugs she may have taken during pregnancy. Instead, she waited until late 1989, at which time she overheard the physician who was treating her for her current pregnancy tell a medical assistant that her medical history revealed "classic symptoms of DES."
*510 On August 14, 1992, plaintiff commenced the present action against a host of DES manufacturers.[1] After discovery was had, several of the defendants[2] moved for summary judgment dismissing the complaint on the ground that it was time-barred under CPLR 214-c (2). The moving defendants argued that the action was untimely because it was commenced more than three years after plaintiff had discovered the reproductive ailments that formed the basis of her claim. Plaintiff opposed the motion, arguing that the time to commence her action did not begin to run until late 1989, when she overheard the conversation between her physician and a medical assistant and thereby learned that her symptoms were likely to be DES related.
The Supreme Court rejected plaintiff's argument and dismissed her complaint. Relying on Michael v Ametelco, Inc. (150 Misc 2d 507, affd sub nom. Michael v Eastern Alloys, 175 AD2d 667), the court held that the Statute of Limitations began to run when plaintiff's reproductive ailments were discovered and that "it is not necessary, for statute of limitations purposes for * * * plaintiff to have known * * * that th[ose injuries] were caused by DES."
On plaintiff's appeal from the Supreme Court's order, the Appellate Division reversed. That Court ruled that "the `discovery' to which [CPLR 214-c (2)] refers is not merely the discovery of the condition or symptoms suffered by the plaintiff, * * * but includes the discovery of the fact that those symptoms are attributable to an injury inflicted upon the plaintiff by a third party" (225 AD2d 372). Reasoning that the parties' submissions gave rise to a question of fact as to when this plaintiff had sufficient information to cause her or a reasonable person in her position to associate her physical symptoms with DES, the Court concluded that summary judgment on the Statute of Limitations question was inappropriate. The Appellate Division subsequently granted defendant Emons Industries, Inc. leave to appeal to this Court, certifying the following question of law: "Was the order of this Court, which reversed the order of the Supreme Court, properly made?"
*511 Enacted in 1986 as part of a larger "tort reform" package (L 1986, ch 682), CPLR 214-c (2) provides that "the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances * * * must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." The focus of this dispute is the intended meaning of the phrase "discovery of the injury." Inasmuch as plaintiff unquestionably knew about the medical condition forming the basis of her claim more than three years before the commencement of her 1992 action, she can succeed in defeating defendants' dismissal motion only if, as she contends, the "discovery of the injury" is not complete within the meaning of the statute until the injured party discerns both the bodily symptoms and the fact that those symptoms have a nonbiological cause.
The interpretation plaintiff urges has some superficial appeal, since it would benefit potential claimants whose symptoms, like plaintiff's, are ambiguous and are not always associated with exposure to a foreign substance. Indeed, plaintiff's theory has enough appeal to commend itself to several courts and commentators (see, e.g., Cochrane v Owens-Corning Fiberglas Corp., 219 AD2d 557 [1st Dept]; Scherrer v Time Equities, 218 AD2d 116; Braune v Abbott Labs., 895 F Supp 530 [ED NY]; Alexander, Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 214-c, 1997 Pocket Part, at 157-158). We conclude, however, that in the final analysis plaintiff's construction is out of harmony with the statutory design and is unsupported by the provision's legislative history. Consequently, it must be rejected.
The central flaw in plaintiff's argument is the difficulty of sustaining it in light of CPLR 214-c (4), which expressly provides for situations in which the plaintiff was aware of the "injury" itself but there was a delay in the discovery of its "cause." Specifically, the provision states:
"Notwithstanding the provisions of subdivisions two and three of this section, where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is *512 earlier, an action may be commenced * * * within one year of such discovery of the cause of the injury; provided, however, if any such action is commenced * * * after the period in which it would otherwise have been authorized pursuant to subdivision two or three * * * the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized."
As is apparent from the above-quoted language, the Legislature anticipated and made specific provision for the problem that arises when the plaintiff has discernible bodily symptoms but the toxic etiology of those symptoms has not yet been discovered. An extension of the time to commence the action is granted under these circumstances, but only if a set of statutorily prescribed conditions is satisfied.[3]
In an effort to avoid the import of CPLR 214-c (4), plaintiff urges us to distinguish between situations in which only the precise toxic substance that caused the injury is unknown and those in which the person experiencing the manifestations of exposure knows neither of the cause nor of the very fact that those symptoms have a nonnatural cause. In plaintiff's view, only the former class of cases are addressed by CPLR 214-c (4). In the latter class of cases, plaintiff contends, the individual cannot be said to have discovered the "injury"  a term that implies harm caused by an outside, nonbiological source. These cases, according to plaintiff, involve something other than discovery of the disorder's "cause" and, thus, there is no inconsistency in by-passing CPLR 214-c (4) provisions for "discovery of the [injury's] cause" in these circumstances.
We conclude, however, that the distinction plaintiff advances is more semantic than real. The knowledge that particular *513 symptoms are attributable to an outside cause is almost invariably coupled with an awareness of the identity of that cause. As a practical matter, physicians do not diagnose medical problems as having a nonbiological cause in a vacuum. It is usually only after the discovery by researchers of the relationship between a particular toxic substance and a particular set of symptoms, such as the now known relationship between thalidomide and certain birth defects or between asbestos and certain lung diseases, that diagnosticians connect the observed symptoms to a nonbiological, outside cause (see generally, Senate Introducer's Mem in Support of Silicone Revival Statute, Bill Jacket, L 1993, ch 419 [describing diagnostic confusion that existed "before any causation * * * was made between the silicone and the injury"]). Indeed, before a scientifically documented connection between a set of symptoms and a particular substance is identified, a diagnosis that an illness or disorder has a nonbiological etiology is necessarily speculative. Thus, for all intents and purposes, discovery that a plaintiff's symptoms were attributable to an injury inflicted by an outside force is the same as "discovery of the cause of the injury" within the meaning of CPLR 214-c (4), and the plaintiff's proposed distinction is illusory.
That CPLR 214-c (2)'s reference to "discovery of the injury" was intended to mean discovery of the condition on which the claim was based and nothing more is also apparent from the legislative history of the provision. As we recently observed in Rothstein v Tennessee Gas Pipeline Co. (87 N.Y.2d 90, 93), CPLR 214-c was enacted to overcome the effect of a line of Court of Appeals decisions holding that toxic tort claims accrue upon "impact" or exposure even though the resulting illness may not be manifested for a long time thereafter (Sponsor's Mem in Support of L 1986, ch 682, 1986 NY Legis Ann, at 287; see, e.g., Matter of Steinhardt v Johns-Manville Corp., 54 N.Y.2d 1008; Thornton v Roosevelt Hosp., 47 N.Y.2d 780; Reis v Pfizer, Inc., 48 N.Y.2d 664; Schwartz v Heyden Newport Chem. Corp., 12 N.Y.2d 212, cert denied 374 US 808; Schmidt v Merchants Desp. Transp. Co., 270 N.Y. 287; see also, Martin v Edwards Labs., 60 N.Y.2d 417). These decisions were regarded as overly harsh because they barred claims by individuals suffering from the latent effects of a harmful substance before the harm was even discovered (see, Sponsor's Mem, op. cit.). The goal of the Legislature in adopting CPLR 214-c was to "provide relief to injured New Yorkers whose claims would otherwise be dismissed for untimeliness simply because they were unaware *514 of the latent injuries until after the limitations period had expired" (id., at 287; see, Jensen v General Elec. Co., 82 N.Y.2d 77, 84).
It is apparent from this history that, in enacting a new "discovery" rule for the commencement of toxic torts, the Legislature had in mind only the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced. The dichotomy in the case law that the Legislature intended to address was that between impact or exposure on the one hand and resulting infirmity on the other. Given that narrow focus, the only reasonable inference is that when the Legislature used the phrase "discovery of the injury" it meant discovery of the physical condition and not, as plaintiff argues, the more complex concept of discovery of both the condition and the nonorganic etiology of that condition.
In this case, it is undisputed that the primary conditions that form the basis of plaintiff's claim  her dysplasia, her miscarriages, her misshapen uterus, and her incompetent cervix  were all known to her by 1988. Thus, her 1992 action was commenced more than three years after her "discovery of the injury" and her complaint was properly dismissed without further inquiry into the reasonableness of plaintiff's late discovery of the connection between her symptoms and her mother's ingestion of DES.[4]
We note in closing our agreement with the general proposition that CPLR 214-c is a remedial measure and that, as such, it should be liberally construed to effectuate its purposes (see, Rothstein v Tennessee Gas Pipeline Co., supra, at 96; McKinney's Cons Laws of NY, Book 1, Statutes § 96, at 209). Even with that axiom of statutory construction, however, we are obliged to interpret the statute in a way that makes sense in light of both the legislative design and the specific problem that the provision was adopted to remedy. Despite the concerns that the dissent expresses, there is nothing in either the language of the statute or its history to suggest that the *515 Legislature intended to make the running of the Statute of Limitations depend on claimants' subjective understanding of the etiology of their conditions. Indeed, if the interpretation and rationale advanced by the dissent were to prevail, the date for commencing an action under CPLR 214-c (2) would depend on such fortuitous circumstances as the medical sophistication of the individual plaintiff and the diagnostic acuity of his or her chosen physician.[5] It is apparent from the over-all statutory plan, however, that only the technical knowledge of the scientific and medical communities were to be considered in determining whether the injured's delay following the discovery of injury should be excused. With that principle in mind, we conclude that the Appellate Division erred in its adoption of plaintiff's view of CPLR 214-c (2).
Accordingly, the order of the Appellate Division should be reversed, with costs, the complaint against defendant Emons Industries, Inc. dismissed and the certified question answered in the negative.
SMITH, J. (dissenting).
CPLR 214-c (2) states, in relevant part, that the three-year Statute of Limitations period for an injury "caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body * * * shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier."
The majority concludes that since CPLR 214-c (4) provides for a five-year extension of the Statute of Limitations where technical, scientific or medical knowledge is insufficient to link *516 an injury with a particular agent, the three-year Statute of Limitations under CPLR 214-c (2) commences from the "discovery of the manifestations or symptoms of the latent disease" (majority opn, at 514) even if the plaintiff does not know that such symptoms are attributable to exposure from a harmful substance. I dissent because the majority effectively removes the factual inquiry into a plaintiff's "exercise of reasonable diligence" under CPLR 214-c (2) from the jury in favor of an objective standard which dispenses with any need to ascertain a plaintiff's knowledge as to the etiology of an injury.
From 1980 or 1981 to March 7, 1988, plaintiff endured four miscarriages and one unsuccessful preterm delivery. In December 1989, plaintiff overheard her doctor, Dr. Kassis, tell another person that she displayed "classic symptoms" of DES exposure. Plaintiff commenced this lawsuit in 1992.
From her first miscarriage until the time plaintiff overheard Dr. Kassis' comment about DES in 1989, plaintiff consulted at least five gynecologists about her inability to carry a child to full term.[1] Although plaintiff was informed that she had dysplasia, a T-shaped uterus and uterine septate, intrauterine adhesions, and an incompetent cervix, none of these gynecologists informed plaintiff that her reproductive difficulties could have arisen from in utero exposure to DES. Plaintiff testified at her deposition that in 1988 she talked with her sisters about the possibility that her mother had taken DES but none of the medical practitioners she consulted raised the possibility that a foreign agent or substance could have caused her injuries.
Supreme Court concluded that this action was time-barred because plaintiff's "bodily structures were affected by her exposure to DES" and plaintiff knew of the physical conditions cited as DES-related injuries prior to 1989. The Appellate Division reversed, concluding that the relevant inquiry was not whether plaintiff knew about her physical abnormalities but whether plaintiff knew that such abnormalities had been caused by the intervention of a "third party," that is, exposure to the "any substance" referred to in CPLR 214-c (2) (225 AD2d 372). Noting the existence of factual questions relating to when plaintiff should have discovered that her physical abnormalities were attributable to DES, the Appellate Division held that this inherently factual issue should be referred to a jury.
*517 We have recently affirmed the long-standing rule in New York State that a person is injured upon exposure to a toxic substance, not upon the physical manifestation of the injury in the human body (see, Consorti v Owens-Corning Fiberglas Corp., 86 N.Y.2d 449; see also, Rothstein v Tennessee Gas Pipeline Co., 87 N.Y.2d 90, 93). Since exposure to DES occurs in utero, until the Legislature enacted CPLR 214-c and the accompanying revival statute (L 1986, ch 682, § 4), injured parties could not seek redress for the harmful and latent effects of DES exposure because such effects could not be detected until well after the three-year Statute of Limitations had expired (see, CPLR 214).
This Court has observed that the primary motivation behind the Legislature's enactment of CPLR 214-c was the concern that persons who are unaware that they have been injured by exposure to a particular substance would be unable to pursue their claims by the time they discovered the nature of their injury (Rothstein v Tennessee Gas Pipeline Co., supra, 87 NY2d, at 96; Jensen v General Elec. Co., 82 N.Y.2d 77, 82-85; Enright v Lilly & Co., 77 N.Y.2d 377, 383). Thus, it was not the abnormal physical condition per se (for example, a T-shaped uterus) which prompted legislative action, but the lack of awareness on the part of injured persons that a particular substance could cause deleterious physical effects which led the Legislature to act.
We have previously noted the sentiment of a member of the New York State Senate that CPLR 214-c was required to "`provide relief to injured New Yorkers whose claims would otherwise be dismissed for untimeliness simply because they were unaware of the latent injuries until after the limitation period had expired'" (Jensen v General Elec. Co., supra, 82 NY2d, at 84, quoting from Mem of Senator R. B. Stafford, reprinted in 1986 NY Legis Ann, at 287; see also, majority opn, at 513-514). However, the existence of such "latent injuries" cannot be determined in a vacuum. They must be linked to a particular substance. The Legislature addressed its concern that injured parties would be unable to discover this link between a substance and the physical manifestation of injury within three years of exposure to the substance by enacting CPLR 214-c. The majority's attempt to parse out these inextricably intertwined concepts by divorcing the "resulting infirmity" from "impact or exposure" (majority opn, at 514) cannot withstand scrutiny. An infirmity "results" only if a substance exerts harmful effects.
*518 Moreover, the majority now burdens plaintiffs with the obligation to commence a lawsuit before any potential defendants have been identified. Without the benefit of hindsight which links a particular substance to a "primary condition" (majority opn, at 509) plaintiffs must now deal with an expiring Statute of Limitations when the only knowledge in their possession is the existence of an abnormal physical condition.
In an apparent repudiation of the Legislature's concern that injured parties would lose access to courts because they lack knowledge that a certain substance causes a certain somatic effect, the majority holds today that, as a matter of law, knowledge of DES exposure induced injury can be imputed to a plaintiff if that plaintiff suffers from some unspecified "medical condition" (majority opn, at 511). That a plaintiff may not know that this condition could give rise to a claim apparently holds no relevance for the majority. The majority similarly disregards the diligence exercised by plaintiffs in attempting to discover the causes of their medical problems.
In taking this stance, the majority transforms a fact-intensive inquiry into the nature of a plaintiff's knowledge as to the deleterious effects of a substance, and the reasonableness of a plaintiff's diligence in acquiring such knowledge, into an objective standard based on the manifestation of physical symptoms identified by the technical, scientific or medical community. The difficulty of determining the reasonableness of the diligence exercised by the plaintiff here is illustrated by the fact that she consulted several medical practitioners for her reproductive problems and none of them mentioned DES as a causal factor of her difficulties.
The implication of the majority's holding is that once scientific, technical or medical knowledge links a substance to a physical condition (see, CPLR 214-c [4]), that knowledge is imputed to the layperson as a matter of law even if that condition may result from a wide variety of causes. This conclusion is troubling because while DES may cause conditions such as a T-shaped uterus and uterine septate in some women, not every uterine septate can be attributed to DES.[2] Moreover, the majority assumes, as a matter of law, that a layperson would *519 know that DES could cause a septate uterus or some undefined "primary condition."
Here, plaintiff contends that she did not know that the physical infirmities identified by her doctors could have been caused by in utero exposure to DES until 1989. Instead of permitting a jury to decide, as an issue of fact, when a plaintiff who suffers from a T-shaped uterus, or the combination of conditions which afflicted the plaintiff here, acts with reasonable diligence in discovering that DES caused her symptoms, such knowledge is simply assumed. The imputation of such technical, scientific and medical knowledge to laypersons as a matter of law is unwarranted given the undoubtedly wide disparity in familiarity with scientific and medical knowledge among women of child-bearing age who could be afflicted with injuries from DES.
By declining to conduct any inquiry into whether reasonable diligence would have revealed that a particular substance caused plaintiff's physical abnormalities, the majority permits "fortuitous circumstances" (majority opn, at 515) to reign supreme. While the level of technical, medical and scientific knowledge is relevant in determining whether a plaintiff has exercised reasonable diligence in discovering a "primary condition," a jury should determine whether this fact alone or in tandem with others should commence the running of the Statute of Limitations.
As the majority notes, "CPLR 214-c is a remedial measure and that, as such, it should be liberally construed to effectuate its purposes" (majority opn, at 514). By narrowly construing "discovery of the injury," the majority removes the fact-intensive issue of when a layperson should know of specialized scientific and medical concepts from the jury and concludes that courts may determine which physical conditions plaintiffs should be assumed to know and when they should have acquired this knowledge as a matter of law. I cannot agree that such an interpretation accords with the remedial purposes of a statute which was enacted because of a desire to permit injured parties court access, when such parties would otherwise be foreclosed from bringing their claims because they lacked awareness that exposure to a particular substance could lead to somatic injuries within a certain time frame.
Order reversed, etc.
NOTES
[1] Because she was then unable to identify the manufacturer of the DES she believed her mother had taken, plaintiff sued a large group of manufacturers under the "market share" theory approved by this Court in Hymowitz v Lilly & Co. (supra).
[2] The moving defendants were Eli Lilly & Co., Kremers-Urban Co., Premo Pharmaceutical Laboratories, Inc., Chromalloy American Corp. and Rhone-Povlenc Rorer Pharmaceuticals, Inc.
[3] Plaintiff had moved in the Supreme Court for permission to amend her complaint "to add allegations under CPLR 214-c (4)." The court, however, denied the motion, noting that "plaintiff * * * has failed to make any showing that technical, scientific or medical knowledge had not been discovered sufficient to allow plaintiff to ascertain the cause of her injury prior to the expiration of the statute of limitations." Further, the court stated, "[p]laintiff cannot seriously suggest that [such] knowledge did not exist in 1988 to diagnose her injuries and their relationship to DES." This ruling is not before us on the present appeal.
[4] We recognize that there may be situations in which the claimant may experience early symptoms that are too isolated or inconsequential to trigger the running of the Statute of Limitations under CPLR 214-c (2). We need not decide in this case, however, precisely where the threshold lies, since there is no doubt that by 1988 this plaintiff was formally diagnosed as having a combination of serious reproductive abnormalities, the very abnormalities that constitute the harm for which she seeks recovery. Under these facts, we need hold only that a "discovery of the injury" occurs within the meaning of CPLR 214-c (2) when the plaintiff is diagnosed with the primary condition for which damages are sought.
[5] The weakness in the dissent's suggested subjective approach is evident from the facts in this case. The consequences of in utero exposure to DES, as well as the most commonly experienced physical manifestations of such exposure, have been well publicized in the past 20 years and there is, thus, considerable public awareness that conditions such as dysplasia misshapen uterus and cervical abnormalities could signal a DES-related injury. Indeed, in this instance, there was evidence that, whatever plaintiff's own level of knowledge was, plaintiff's sister was aware of the existence of a DES risk even before she and plaintiff discussed the matter in March of 1988. As is apparent from these circumstances, awareness of matters concerning public health is often spread unevenly throughout the population, depending on such variables as an individual's interest in current events and his or her exposure to news media. The rule of law the dissent suggests would make the commencement of the statutory limitations period depend on such personal variables, giving rise to an unacceptable degree of randomness and arbitrariness.
[1] Plaintiff consulted Dr. Michael Cummings, Dr. Michael Shaw, Dr. Badaway, Dr. Michael Baggish, and Dr. Iskander Kassis. Plaintiff also saw a family physician at Endwell Family Physicians for Pap smears. Endwell Family Physicians diagnosed plaintiff's incompetent cervix.
[2] Indeed, making such assumptions as a matter of law may also remove the issue of causation from the jury. Here, defendant contends that "Miscarriages clearly have biological causes independent of DES exposure, and, in fact, Emons does not concede that DES exposure causes miscarriages." Moreover, at least one DES manufacturer has argued that plaintiffs seeking redress for DES induced injuries cannot point "to a single study or article that in any way evidences the purported causal connection between DES and a uterine septum. The reason for this failure is simple. There is no such evidence."