AMENDED SUMMARY ORDER
UPON DUE CONSIDERATION, IT IS HEREBY ORDERED that the judgment of the District Court be AFFIRMED.
Familiarity is assumed as to the facts, the procedural context, and the specification of appellate issues.
Throughout the 1970s, Keene Corporation (“Keene”) was a conglomerate that owned, among other things, an insulation business that once manufactured and sold asbestos-containing products. Between *277 1981 and 1988, Keene engaged in a corporate restructuring in which it first created appellee-defendant Bairnco Corporation (“Bairnco”), and, through a “drop down” merger, became a subsidiary of Bairnco. Over the next several years, Keene sold a number of its constituent businesses to other subsidiaries of Bairnco. Defendants-appellees Kaydon Corporation, The Genlyte Group Incorporated, Kasco Corporation, Shielding Systems Corporation, and Arlon Inc. each were created in order to, and in fact did, purchase assets from Keene. Defendant-appellee Glenn W. Bailey (“Bailey”) was one of the founders of Keene, and was an officer and director of Keene, Bairnco, and the other corporate defendants. Throughout the 1970s, 1980s, and into the early 1990s, Keene was named in an increasing number of asbestos-related lawsuits. In 1993, upon becoming unable to purchase appeal bonds, Keene filed for bankruptcy.
Plaintiffs-appellants are the trustees of Keene Creditors Trust, a trust instituted to represent persons exposed to asbestos-containing products manufactured by Keene and the insulation business it purchased in 1967. Pursuant to § 544(b) of the Bankruptcy Code, such a “trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim....” 11 U.S.C. § 544(b)(1). According to a stipulation approved by the bankruptcy court, the “applicable law” here is New York law. In 1996, plaintiffs brought suit in the United States District Court for the Southern District of New York, alleging that Keene sold its constituent businesses and paid dividends to Bairnco as part of a scheme to divest itself of assets that otherwise would have been available to Keene’s asbestos-victim creditors. Plaintiffs contended that all of the corporate defendants were liable to these creditors under theories of actual fraudulent conveyance, see N.Y. Debt. & Cred. Law § 276 (McKinney 2003), constructive fraudulent conveyance, see id. §§ 273-75, and successor liability. Further, plaintiffs sought to pierce the corporate veil in order to impose Keene’s asbestos liabilities on Bairnco. Finally, plaintiffs alleged that, as a director of Keene, Bailey caused Keene to pay unlawful dividends to Bairnco, see N.Y. Bus. Corp. Law §§ 510, 719 (McKinney 2003), and, by virtue of his involvement with the asset sales and dividend payments, breached his fiduciary duties as a corporate officer and engaged in corporate misconduct. See id. § 720(a)(1)(A).
Defendants initially moved for partial summary judgment on statute-of-limitations grounds, arguing, inter alia, that plaintiffs were time-barred from bringing constructive-fraud claims based on transactions that occurred prior to 1988. In October 1998, the district court (Chin, J.) denied defendants’ motion in part and granted it in part, holding that plaintiffs could bring pre-1988 claims on behalf of one category of creditors, the so-called “inactive docket” claimants. See Lippe v. Bairnco Corp., 225 B.R. 846, 855-56 (S.D.N.Y.1998) (“Lippe I”). However, the court later reconsidered that ruling and held that plaintiffs could not satisfy the time-bar for any pre-1988 claims brought under New York Debtor & Creditor Law (“DCL”) §§ 273, 274, or 275, including those brought on behalf of the “inactive docket” claimants. See Lippe v. Bairnco Corp., 229 B.R. 598, 601-02 (S.D.N.Y.1999) (“Lippe II”).
Following years of discovery and numerous applications to the district court with regard to discovery, defendants moved in January 2003 to exclude plaintiffs’ experts from testifying as to the value of assets sold by Keene to the corporate defendants. *278 That motion was granted. See Lippe v. Bairnco Corp., 288 B.R. 678 (S.D.N.Y. 2003) (“Lippe III”). In March of 2003, the district court denied plaintiffs’ motion to substitute a new valuation expert and granted defendants’ motions for summary judgment, dismissing plaintiffs’ claims of actual and constructive fraud, as well as plaintiffs’ claims under theories of unlawful dividend payments, successor liability, piercing the corporate veil, breach of fiduciary duty, and corporate misconduct. See Lippe v. Bairnco Corp., 249 F.Supp.2d 357 (S.D.N.Y.2003) (“Lippe IV”). Plaintiffs appeal the district court’s rulings regarding plaintiffs’ proffered experts; its grant of summary judgment to defendants on plaintiffs’ fraudulent-conveyance claims; and its grant of summary judgment to defendants on plaintiffs’ remaining claims, including the court’s final statute-of-limitations determination. For the reasons that follow, we fully agree with the district court’s thoughtful and thorough decisions and affirm them in all respects.
I. Plaintiffs ’ Proffered Experts
“We review a district court’s decision to exclude expert testimony for abuse of discretion, and we have explained that ‘[a] decision to admit or exclude expert ... testimony is not an abuse of discretion unless it is manifestly erroneous.’ ” Zaremba v. General Motors Corp., 360 F.3d 355, 357-58 (2d Cir.2004) (quoting Amorgianos v. Nat’l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir.2002)) (internal citation and quotation marks omitted). Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Federal Rules of Evidence “assign to the trial judge the task of ensuring that an expert’s testimony both rests on a reliable foundation and is relevant to the task at hand.” Id. at 597. In carrying out this task, a trial judge is “to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Accordingly, the Federal Rules of Evidence permit the admission of expert testimony only “if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.” Fed.R.Evid. 702.
In granting defendants’ motion to exclude the testimony of plaintiffs’ valuation experts, Thomas E. Dewey, Jr. and Professor Jocelyn D. Evans, the district court stated it was “simply not persuaded that their proposed testimony rests on a ‘reliable foundation.’ ” Lippe III, 288 B.R. at 689. The court provided no less than eighteen reasons why plaintiffs’ valuation experts were so unreliable as to be inadmissible under Rule 702. See id. at 689-701. Plaintiffs argue that the district court erred in criticizing Dewey’s failure to perform a “discounted cash flow” (“DCF”) analysis in addition to the “comparable companies” analysis that he did perform. In our view, much of the problem in this regard is that Dewey failed to adequately explain why he chose not to use DCF as a check against the comparables he employed in the valuations. The remainder of plaintiffs’ argument focuses on the district court’s criticism of both Dewey’s and Evans’ addition of “control premiums” to their valuations. Plaintiffs contend that the addition of control premiums is a standard valuation technique. However, the district court was clear that its primary concern over control premiums was not that they were applied, but rather how they were applied, including Dewey’s and *279 Evans’ failure to explain the reasons for the percentages used. See id. at 691-93. The experts simply failed to “offer a meaningful explanation” as to why they added control premiums to their valuations. Id. at 693.
Most significantly, plaintiffs’ argument goes little further. Plaintiffs suggest that all of the district court’s other observations merely go to the weight of the evidence — and not its admissibility. While it is true that “[a] minor flaw in an expert’s reasoning or a slight modification of an otherwise reliable method will not render an expert’s opinion per se inadmissible,” Amorgianos, 303 F.3d at 267, Dewey’s and Evans’ testimony exhibited considerably more than “minor flaws.” Among the indicia of unreliability were Dewey’s inability to explain a number of variables and assumptions used in his analysis, such as price/earnings multipliers, income projections, and which companies were comparable to those being valued; his failure to adjust his calculations to account for variances between the businesses sold by Keene and the companies against which he compared them; and his commission of numerous outright — and largely admitted — errors in analysis. Similarly, Evans asserted wildly implausible valuations of Keene and the Shielding Systems businesses; relied on plaintiffs’ counsel to provide her with information on “comparable companies” — without verifying whether those companies were indeed comparable and without adjusting her analyses to account for variances; and failed to explain why her “comparable companies” and DCF analyses did not yield similar results — after admitting that they should. These examples are a mere sample of the flaws in Dewey’s and Evans’ proffered testimony. The record, as a whole, clearly demonstrates that the district court did not abuse its discretion in granting defendants’ motion to exclude that testimony as inadmissible under Rule 702.
Moreover, the district court did not abuse its discretion in denying plaintiffs’ motion to hold a hearing on the admissibility of Dewey’s and Evans’ testimony. The Supreme Court explained in Kumho Tire that “[t]he trial court must have the same kind of latitude in deciding how to test an expert’s reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether ... that expert’s relevant testimony is reliable.” 526 U.S. at 152 (emphasis in original). As the district court aptly noted:
[T]he testimony would add nothing. The parties have provided a voluminous record, which includes the experts’ reports, complete transcripts of the experts’ depositions, documents reviewed by the experts, transcripts of depositions of other witnesses, and treatises on valuation. The experts have had a full and fair opportunity to explain their opinions.
Lippe III, 288 B.R. at 701 n. 7. We agree. Given the amount of information upon which the district court made its decision, it did not abuse its discretion by denying a hearing.
Finally, the district court denied plaintiffs’ motion to substitute Laureen M. Ryan as a new valuation expert, and also denied plaintiffs’ motion to include Ryan’s report in the summary judgment record. See Lippe IV, 249 F.Supp.2d at 385-87. In its 2003 ruling, the court noted that this case had been pending since 1996; that plaintiffs had retained Dewey and Evans in 1998 and 2000, respectively; that Dewey’s and Evans’ expert reports were filed in 2001; that defendants prepared their challenges to those reports for the next one and one-half years; and that Dewey and Evans were finally deposed by defen *280 dants in 2002. Id. at 385. The parties then submitted over 900 pages of briefing on defendants’ motions to exclude plaintiffs’ expert evidence and for summary-judgment, the latter based in large part on the former. Id. Seven days after the district court granted defendants’ motion to exclude plaintiffs’ experts, and just “[t]wo days before the argument of the summary judgment motions, plaintiffs raised the possibility of designating a new valuation expert. At the outset of the argument of the summary judgment motions, plaintiffs’ counsel handed up [Ryan’s] new valuation report....” Id.
The district court explained its decision to deny plaintiffs’ motion to substitute Ryan as a valuation expert, noting:
Plaintiffs had more than a full and fair opportunity to find proper valuation experts. In fact, they had years to do so. After they chose Dewey and Evans, plaintiffs were placed on notice, months ago, that their reports, opinions, and testimony were flawed in many respects. Yet, plaintiffs made no effort to add or substitute other experts — until all the motions, including the summary judgment motions, had been filed and briefed and the Daubert motions had been decided.
Id. at 386. The court further observed that defendants would be prejudiced by having to meet this new report, that a “new round of Daubert motions and a new round of summary judgment motions ... would surely take another year, if not longer,” and that it would be unfair to the defendants to permit the plaintiffs an opportunity to cure their case after having made “some ill-advised tactical choices.” Id. Accordingly, the district court precluded plaintiffs from offering Ryan’s testimony or supplementing the summary judgment record with Ryan’s report.
Although plaintiffs were long on notice of defendants’ criticisms of Dewey’s and Evans’ reports, plaintiffs decided not to respond to those criticisms until the district court finally excluded the evidence as unreliable. Indeed, “although [plaintiffs were] on notice every step of the way that [defendants were] challenging [their] experts, [they] made no attempt to add or substitute other evidence.” Weisgram v. Marley Co., 528 U.S. 440, 456, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000). In addition to the delay that would likely ensue from permitting plaintiffs to introduce a new expert at this late juncture, cf. Kirstein v. Parks Corp., 159 F.3d 1065, 1069 (7th Cir. 1998), it is simply the case that “fairness does not require that a plaintiff ... be afforded a second chance to marshal other expert opinions and shore up his case.” Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 250 (6th Cir.2001). As the district court well documented, plaintiffs had a full and fair opportunity to develop and defend their choice of experts. That they failed in that endeavor does not entitle them to begin anew. Thus, the district court did not abuse its discretion in denying plaintiffs’ motion to substitute Ryan as a valuation expert, or in denying plaintiffs’ motion to include Ryan’s report in the summary judgment record.
II. Plaintiffs’ Fraudulent-Conveyance Claims
The focus of plaintiffs’ argument below was that Keene sold its assets to the corporate defendants for less than fair value, and thus that those transfers were fraudulent as to Keene’s asbestos-victim creditors. As explained above, plaintiffs have no admissible evidence that those transfers were for less than fair value. Indeed, the district court granted defendants’ motion for summary judgment in part because plaintiffs’ failure to present any admissible evidence that Keene received less than fair *281 value for its assets meant that plaintiffs had presented no evidence from which a jury could conclude that Keene’s creditors had been harmed. See Lippe IV, 249 F.Supp.2d at 377-78.
In New York, fraudulent-conveyance liability may not attach absent some prejudice to a creditor of the transferor. In HBE Leasing Corp. v. Frank, 48 F.3d 623 (2d Cir.1995), this Court recognized that under the DCL, “a transfer may not be challenged as fraudulent unless it prejudices the complaining creditor.” Id. at 637 n. 10; see also Travelers Ins. Co. v. 633 Third Assocs., 973 F.2d 82, 86 (2d Cir. 1992); Willcox v. Goess, 22 F.Supp. 841, 843-44 (S.D.N.Y.1938); Bryce v. Nat’l City Bank of New Rochelle, 17 F.Supp. 792, 796 (S.D.N.Y.1936); Buckley Petroleum Prods., Inc. v. Goldman, 28 A.D.2d 640, 641, 280 N.Y.S.2d 876 (4th Dep’t 1967); Newfield v. Ettlinger, 22 Misc.2d 769, 774-75, 194 N.Y.S.2d 670 (N.Y.Sup.Ct.1969); Suffolk & Nassau Amusement Co. v. Ambrose, 145 N.Y.S.2d 424, 426 (N.Y.Sup.Ct.1955); Prudential Sav. Bank v. Grant, 99 N.Y.S.2d 602, 603 (N.Y.Sup.Ct.1950).
Plaintiffs suggest that Keene’s creditors were in some way “prejudiced” by Keene’s asset transfers. But plaintiffs can advance no evidence from which a reasonable jury could conclude that Keene’s asbestos creditors were prejudiced by the sale of Keene’s assets. Plaintiffs’ theory below, that Keene received less than fair value for its assets, relied on the valuations performed by Dewey and Evans. Plaintiffs have not offered other evidence from which a reasonable jury could conclude that the transfers hindered their ability to move against Keene’s unchanged net worth. Rather than converting its assets into a form unreachable by its creditors, Keene transformed them into a medium arguably more accessible: cash.
Plaintiffs suggest that by exchanging its assets for cash, Keene exchanged dynamic, growing businesses for static, idle cash— cash that it then frittered away by, among other things, paying unlawful dividends to Bairnco. However, Kidder Peabody & Co. issued “fair value” opinions for each of the asset transfers. Such opinions took into account the future income potential of the businesses valued, discounted to present value. It is thus a crude simplification to suggest that the exchange of a business for cash is somehow inherently unfair; Keene received an amount that accounted for future potential growth.
Moreover, Keene’s subsequent use of its cash belies any suggestion that it intended to frustrate creditors by converting its assets into cash and letting that cash languish or dissipate. In the years following the first sale in question, Keene engaged in numerous acquisitions of businesses and attempted, albeit somewhat unsuccessfully, to develop those businesses. Given these facts, plaintiffs’ theory devolves into the suggestion that, in 1981, Keene hatched a scheme to divest itself of assets in order to shield them from asbestos liability; Keene began selling assets, and, with the money it earned in those sales, bought more assets' — only to fraudulently sell them in order to shield them from asbestos liability. Further, plaintiffs have not presented evidence that Keene’s payment of dividends to Bairnco was improper. Keene paid Bairnco quarterly dividends at a rate of 45 percent of Keene’s net income for the previous quarter, a rate agreed upon in 1981 after Smith Barney advised Keene of comparable, prevailing dividend rates.
In sum, for plaintiffs to survive summary judgment on their claims for actual and constructive fraud, they must at the very least be able to prove that Keene’s creditors were prejudiced by the asset *282 sales. As plaintiffs’ only plausible theory of harm is that Keene received less than fair value in those sales, and plaintiffs have no evidence supporting that theory, plaintiffs cannot survive summary judgment. Thus, the district court did not err in granting defendants’ motions for summary judgment on all of plaintiffs’ fraudulent-conveyance claims.
Further, plaintiffs’ constructive-fraud claims under DCL § 273 fail for an absence of proof that Keene was insolvent at the time of, or was rendered insolvent by, the asset transfers in question.[1] See N.Y. Debt. & Cred. Law § 273. The DCL explains that “[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.” Id. § 271(1). A “ ‘[cjreditor’ is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.” Id. § 270.
Plaintiffs claim that Keene underestimated its asbestos-related liabilities, and that on a proper estimate Keene was insolvent at the time of the asset transfers in question. Plaintiffs contend that future claims of persons exposed to asbestos — but not yet symptomatic — must be included in a debtor’s “probable liability.” N.Y. Debt. & Cred. Law § 271(1). Plaintiffs maintain that such persons are “creditors” insofar as their claims fit within the rubric of “matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.” Id. § 270. With these definitions of “debt” and “creditors,” plaintiffs argue that the estimates of their asbestos-liability expert, Dr. Peterson, demonstrate that Keene should have estimated future case filings far in excess of the number it actually estimated.
Using Peterson’s numbers, Keene’s total asbestos-liabilities range from approximately $1 billion to approximately $2 billion. In calculating these figures, Peterson included tort claims based on injuries expected to manifest as late as 2027. However, DCL § 271(1) refers to “existing debts” as the relevant starting point of a solvency analysis. Under New York law, “in tort cases the relationship of debtor and creditor arises the moment the cause of action accrues.” Shelly v. Doe, 249 A.D.2d 756, 757, 671 N.Y.S.2d 803 (3d Dep’t 1998); accord Marcus v. Kane, 18 F.2d 722, 723 (2d Cir.1927). Thus, the hypothetical existence of an unaccrued tort claim does not give rise to a debtor-creditor relationship. There is no “existing debt.” The question arises, then, whether the future claims included in Dr. Peterson’s estimates had yet accrued — that is, whether they were “existing debts” for purposes of a solvency analysis.
Under current New York law, a cause of action accrues in a toxic-tort case not on the date of exposure, but rather on “the date of discovery of the injury by the plaintiff or ... the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.” N.Y. C.P.L.R. § 214-c; see also Blanco v. Am. Tel. & Tel. Co., 90 N.Y.2d 757, 766, 666 N.Y.S.2d 536, 689 N.E.2d 506 (1997) (Wesley, J.) (explaining that § 214-c “was en *283 acted to abrogate the exposure rule which [the New York Court of Appeals] had [previously] formulated and adhered to” in toxic tort cases); Matter of New York County DES Litigation, 89 N.Y.2d 506, 513, 655 N.Y.S.2d 862, 678 N.E.2d 474 (1997) (holding that § 214-c’s “reference to ‘discovery of the injury’ ... mean[s] discovery of the condition on which the claim [is] based and nothing more”) (emphasis added).
It is true that under New York’s pre1986 statute of limitations, a toxic-tort cause of action accrued upon exposure to a toxic substance; under this rule, toxic-tort plaintiffs, subject as they were to the latent effects of exposure, often found their claims untimely. See, e.g., Snyder v. Town Insulation, 81 N.Y.2d 429, 599 N.Y.S.2d 515, 615 N.E.2d 999 (1993); Schmidt v. Merchants Despatch Transp. Co., 270 N.Y. 287, 200 N.E. 824 (1936). But it is clear that, for purposes of determining whether a toxic-tort cause of action has accrued, C.P.L.R. § 214-c has displaced cases such as Snyder and Schmidt. Indeed, the remedial effect of § 214-c highlights why, even if the pre-1986 statute applied to the analysis of Keene’s solvency, plaintiffs have not produced evidence that Keene’s “probable liability” exceeded its assets. Section 214-c ameliorated the harshness of the exposure rule by extending the time in which toxic-tort plaintiffs could bring suit. If the exposure rule — and its corollary three-year statute of limitations — applied to Keene’s asbestos-victim “creditors,” then the only such creditors to whom Keene had “probable liability” would be those who had been exposed within three years prior to the solvency analysis in question. Surely this is a small percentage of those included in Dr. Peterson’s estimates. But in any event, plaintiffs’ have provided no evidence in this regard.
Thus, plaintiffs are caught in the horns of a dilemma. If the present discovery rule applies, then to the extent that Dr. Peterson’s estimates depend on the inclusion of unsymptomatic, future claimants, those estimates depend on the inclusion of unaccrued claims. And because the estimates depend on unaccrued claims, they depend on amounts that are not “debts” under the DCL. But if the pre-1986 exposure rule applies, then Keene’s liability for any given solvency analysis is severely limited to a three year window of pre-analysis exposure. In either case, Dr. Peterson’s estimates overstate Keene’s liabilities. As plaintiffs have provided no other evidence of Keene’s assets-to-liabilities ratios, plaintiffs have offered no evidence from which a reasonable jury could conclude that Keene was insolvent at the time of, or was rendered insolvent by, any of the transactions in question.
III. Plaintiffs’Remaining Claims
We have considered plaintiffs’ remaining arguments and consider them to be either rendered moot by the determinations above — or simply without merit.
A. Payment of Unlawful Dividends
Under New York Business Corporations Law, “[a] corporation may declare and pay dividends ... except when currently the corporation is insolvent or would thereby be made insolvent....” N.Y. Bus. Corp. Law § 510(a). Plaintiffs have not presented evidence from which a reasonable jury could conclude that Keene was insolvent at the time it paid its quarterly dividends to Bairnco.
B. Successor Liability
Under New York law, “[a] corporation may be held liable for the torts of its predecessor if (1) it expressly or impliedly assumed the predecessor’s tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing *284 Corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.” Schumacher v. Richards Shear Co., 59 N.Y.2d 239, 245, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983). Plaintiffs do not challenge the district court’s early ruling that plaintiffs’ only possible ground of establishing successor liability is under the fourth factor above. See Lippe I, 225 B.R. at 858. Thus, insofar as plaintiffs have failed to establish that defendants acted fraudulently, plaintiffs have failed to establish the “fraudulent purpose” exception to the traditional rule that a successor corporation is ordinarily not liable for the torts of its predecessor. See Schumacher, 59 N.Y.2d at 244, 464 N.Y.S.2d 437, 451 N.E.2d 195. Further, although plaintiffs suggest that an “equity and fairness” exception to the no-liability rule should apply, plaintiffs offer no authority for such an exception. Finally, the theory of successor liability is appropriate where a defendant succeeds to substantially all of its predecessor’s assets, see, e.g., Nettis v. Levitt, 241 F.3d 186, 193 (2d Cir.2001); no one defendant here did so.
C. Piercing the Corporate Veil
In New York, “piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiffs injury.” Morris v. New York State Dep’t of Taxation and Finance, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993) (emphasis added). Although plaintiffs suggest that “domination” is a ground for veil-piercing liability that is distinct from fraud, New York law is clear that domination and fraud are required. See id. Plaintiffs have failed to produce evidence that Bairnco dominated Keene in the furtherance of the alleged fraud. Further, as plaintiffs cannot prove injury to Keene’s creditors, plaintiffs cannot demonstrate that defendants’ conduct “resulted in ... injury.” Id.
D. Breach of Fiduciary Duty/Corporate Misconduct
According to New York Business Corporations Law (“BCL”), “[a]n action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief .... to compel the defendant to account for his official conduct in ... [t]he neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.” N.Y. Bus. Corp. Law § 720(a)(1)(A). Because plaintiffs have presented no evidence from which a reasonable jury could conclude that any one of the defendants acted fraudulently, that Keene was rendered insolvent by any of the actions of the defendants, or that Keene’s creditors were harmed, plaintiffs have no grounds for claiming that Bailey breached his fiduciary duties or committed corporate misconduct.[2]
E. Statute of Limitations
The district court held that plaintiffs could not satisfy the statute of limitations for any pre-1988 claims brought under DCL §§ 273, 274, or 275. See Lippe II, 229 B.R. at 601-02. On appeal, plaintiffs argue that New York’s statute of limitations may be avoided for two categories of *285 claims: those brought on behalf of the U.S. Pension Benefits Guarantee Corp. and those brought on behalf of “inactive docket” claimants. Plaintiffs also argue that the district court abused its discretion in declining to use principles of “equitable estoppel” to toll the statute of limitations. Given that the district court did not err in dismissing plaintiffs’ fraudulent-conveyance claims in toto, we need not reach the issue of whether the plaintiffs can satisfy the statute of limitations.
For the reasons set forth above, the judgment of the District Court is hereby AFFIRMED.

. Although not necessary to the determination of plaintiffs’ fraudulent-conveyance claims— given that plaintiffs have failed to demonstrate injury for those claims — the issue of solvency is both an alternative ground on which we affirm the district court's ruling with regard to plaintiffs’ DCL § 273 claims and an independent ground on which we affirm the court’s ruling with regard to plaintiffs’ unlawful-dividends claim. See infra Section III.A.

. Further, even if plaintiffs could produce evidence in support of their claim under BCL § 720, they could only do so to the extent that they represent "judgment creditors.” N.Y. Bus. Corp. Law § 720(b).