OPINION OF THE COURT
Martin Shulman, J.
Defendant, Colgate-Palmolive Company, a Delaware corporation with a principal place of business in New York (C-P or defendant), has filed an in limine motion of apparent first impression in asbestos litigation to apply Oregon law which would cap any potential noneconomic damages award plaintiffs, Lori *163 Konopka-Sauer and Richard Konopka, as executors of the estate of Karen Tedrick, could receive in this personal injury/wrongful death action.
Factual Background[1]
Prior to her death, decedent plaintiff, Karen Tedrick (plaintiff, Karen or Tedrick), filed her personal injury action in New York on November 14, 2008, alleging she contracted mesothelioma from asbestos exposure through her historic use of Cashmere Bouquet dusting powder, a talc powder product C-P manufactured and sold (talc powder or product). The following is plaintiffs brief life story.
Plaintiff, born on November 6, 1946, was raised and educated in Michigan and continuously resided in that state until April 1969 (during that 23-year period, Tedrick either resided in family residences, college housing and/or her own apartment) (VBT tr at 6, lines 6-18; EBT tr at 41, lines 5-17; at 47, lines 12-24; at 51, lines 21-25; at 52, lines 1-3). In April 1969, Tedrick was hired as an American Airlines flight attendant, left Michigan to complete a two-month training course at American Airlines Stewardess College in Dallas/Fort Worth, Texas and resided there on campus (EBT tr at 56, lines 20-22; at 57, lines 6-14).
After successfully completing the flight attendant training program, Tedrick was posted to New York City to cover domestic flights to and from LaGuardia, JFK and Newark Airports (VBT tr at 27, lines 6-25). During the next two years, plaintiff with three and then two of her colleagues successively shared two one-bedroom apartments in New York City. One Manhattan rental apartment was located at 63rd Street and 1st Avenue and the second was located at 77th Street and York Avenue (VBT tr at 28, lines 1-14). Depending on her flight schedules, plaintiff would on the average stay at her Manhattan apartments from two to five nights a week (EBT tr at 67, lines 23-25; at 68, lines 1-9). Concerning the 77th Street apartment, Tedrick stayed there only a little over six months and in the summer of 1971 transferred to American Airlines’ Los Angeles, California base to be closer to George Ulm, someone she was then dating and whom she eventually married in January 1972 (EBT tr at 78, lines 2-14). Plaintiff never returned to New York.
Like mother, like daughter, and from the age of 12, plaintiff began using the talc powder. She liked its floral scent which *164 reminded her of her mother and made its use a part of her daily hygiene regimen (sometimes multiple times a day) and always after every bath/shower (VBT tr at 14, lines 5-24; at 15, lines 1-28; at 20, lines 23-25; EBT tr at 211, lines 15-25). Plaintiff was generous with her use of this product on her person and talc powder residue would typically cloud the air and settle on surfaces in any bathroom she used (VBT tr at 19, lines 10-21). For almost 15 years, Tedrick exhibited brand loyalty through her daily and repeated use of this product. However, because plaintiff had fortuitously married wealthy, she was able to then afford “more expensive . . . [pjowders [e.g., Chanel No. 19], makeup[ ] [and] perfume,” and sometime in 1972, Tedrick began transitioning off the product. Certainly after her marriage to Ulm, plaintiff no longer used the talc powder (EBT tr at 216, lines 21-25; at 217, lines 1-19). Eventually, Tedrick stopped using any fragrance product in the late 1970s due to allergies (EBT tr at 224, lines 12-25).
From Los Angeles, plaintiff moved to Chicago, Illinois in March 1972, and after four years, divorced Ulm (EBT tr at 88, lines 2-3). From 1976 to 1985, plaintiff engaged in various jobs, remarried and divorced again, completed her course work at Northeastern University to finally obtain a B.A. in psychology and relocated back to Los Angeles (EBT tr at 92-127). During that period, Tedrick, while employed in the social services field, actively pursued her interest in yoga as a therapeutic modality and became a certified yoga instructor (VBT tr at 34, lines 10-25; at 35, lines 1-19). In 1993, plaintiff moved to Oregon, bought a home and became a mental health care professional until she retired in 2008 at or about the age of 62 (VBT tr at 38, lines 23-25; at 39, lines 1-25; at 40, lines 1-22).
Shortly after Karen retired, she began exhibiting flu-like symptoms (i.e., dry cough, weakness, fatigue, etc.) (VBT tr at 45, lines 3-14) and experiencing unusually intense pain in the upper part of her body (VBT tr at 45, lines 15-25; at 46, lines 1-16). In September-October 2008, after consulting with various specialists, undergoing imaging studies and having a needle biopsy, Karen learned she had malignant pleural mesothelioma,[2] would suffer progressive breathing difficulties and have a pain- *165 filled, remaining life expectancy of anywhere from eight to nine months (VET tr at 50, line 11-25; 51, lines 1-22). Plaintiff further learned that the standard treatments available to treat her incurable cancer (i.e., induction chemotherapy, extrapleural pneumonectomy* *[3] and hemithoracic radiation therapy after surgery) (exhibit 9 to Thorn opp aff) might prolong her life but the quality of her life would be poor (VBT tr at 52, lines 5-25; at 53, lines 1-25; at 54, line 1). Karen believed she could manage her disease with yoga and other holistic approaches; however, this progressively debilitating disease evidently overwhelmed her. Within a year of diagnosis, Karen decided to end her life and did so in accordance with the Oregon Death with Dignity Act (ODWDA [Or Rev Stat Ann § 127.800 et seq.]; exhibit 2 to Thorn opp aff).[4]
Shortly thereafter, Oregon counsel was retained to admit plaintiffs will to probate in the Circuit Court of the State of Oregon for the County of Multnomah (exhibits 3, 4 to Shaw opp aff), and Karen’s brother, Richard Konopka, and sister, Lori Konopka-Sauer, were appointed her personal representatives (exhibit 3 to Thorn opp aff. On April 13, 2010, plaintiff’s siblings became plaintiffs in this action (estate-plaintiffs) and amended the complaint to assert a wrongful death claim against C-E Earenthetically, Tedrick’s brother had been a long-term resident of Oregon, but, because of his career in the military, *166 maintains a second home in Georgia (see exhibit 4 to Thorn opp aff), whereas plaintiffs sister is currently a Georgia resident. Neither sibling has ever worked or resided in New York. Defendant’s In Limine Motion
In its motion, C-P essentially contends that under New York choice of law principles, Oregon Revised Statutes Annotated § 31.710 (Damages Cap Law)[5] must apply to any recovery in this personal injury/wrongful death action. Defendant’s central argument points are as follows:
Prefatorily, physician-assisted suicide is otherwise a crime in New York,[6] and deliberate suicide may constitute an intervening cause precluding a wrongful death claim in New York as well,[7] thus, estate-plaintiffs strategically rely on Oregon Revised Statutes Annotated § 127.890[8] to sustain their wrongful death claim here in New York but conveniently ignore the Damages Cap Law to rely on New York law to potentially recover noneconomic damages without any limitation (a calculated attempt at forum shopping);
Plaintiffs alleged asbestos-related injury did not occur during the times and at places of exposure as an end-user of the talc powder (initially and primarily in Michigan[9] and with less frequency in New York), but rather when Tedrick was first *167 diagnosed and then treated for mesothelioma in Oregon, which, unlike New York, is the “place of the tort for purposes of choice of law analysis” (defendant’s mem of law at 7);[10]
Oregon has the greatest outcome-interest here as it was in this state where plaintiff was domiciled and maintained a long-term residence, became ill and was diagnosed with mesothelioma and where she subsequently chose to end her life under the ODWDA and it is in Oregon where her personal representatives have probated her will to presently administer her estate which lists as an asset any potential recovery to be had in this New York action; and
Since the conflict of law issue here involves whether to apply Oregon’s Damages Cap Law in this action, it is properly characterized as a loss allocation issue and not a conduct regulating one, thus, “New York courts have rejected any public policy concerns and uniformly concluded that a decedent’s home state has the greatest interest in resolving loss allocation issues arising out of personal injury and wrongful death actions” (id. at 10).
Estate-Plaintiffs’ Opposition
In opposing defendant’s in limine motion to apply the Damages Cap Law, estate-plaintiffs contend:
Karen’s exposure to C-P’s product and her resultant terminal illness led to plaintiffs courageous choice to end her profound suffering and legally die with dignity;
Oregon Revised Statutes Annotated § 127.890 (3) (n 8, supra) expressly forecloses defendant from making any attempt to limit estate-plaintiffs’ recovery for noneconomic losses;
Because New York was at one time Tedrick’s and C-P’s common domicile and the locus of the tort (Tedrick’s injury occurred when she frequently inhaled the alleged asbestos-containing talc powder as a Manhattan resident from 1969-1971), the Neumeier choice of law rules* [11] require that New York law must apply;
*168 Defendant disingenuously accuses plaintiff and estate-plaintiffs of forum shopping as New York is the proper location for this lawsuit;
Relying on C-P’s own argument that plaintiff should be held to the law of the jurisdiction where the “last event” occurred, then New York law would still control as it was in this state where she was last exposed to the product;
Defendant’s reference to the possible application of Michigan law to limit estate-plaintiffs’ recovery for noneconomic losses is a red herring, especially when plaintiffs “domicile, . . . [C-P’s] corporate headquarters, . . . [C-P’s] tortious conduct and Ms. Tedrick’s injury caused by her last use of . . . [the talc powder] all occurred in the common forum of New York.” (Estate-plaintiffs’ opp mem of law at 14); and
New York’s Constitution[12] and its public policy against damages caps are clearly in conflict with the Damages Cap Law and require New York to apply its own law.
Discussion
This case presents an actual conflict between New York and Oregon concerning the substantive issue as to the amount of damages a plaintiff may recover for noneconomic losses in a personal injury/wrongful death action. New York has no limitation on the amount of such recovery, whereas Oregon’s Damages Cap Law limits such recovery to $500,000.
In its choice of law analysis, a court looks to the state which has the greatest outcome-interest in an action, and towards *169 that end will usually utilize and apply one of the three Neumeier rules. Again, the court’s required interest analysis must particularly focus on, and then apply, “the law of the jurisdiction having the greatest interest in the litigation . . . and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.” (Schultz v Boy Scouts of Am., 65 NY2d 189, 197 [1985].) “Under this formulation, the significant contacts are . . . the parties’ domiciles and the locus of the tort.” (Id. [citations omitted].) Further, a distinction must be
“drawn between laws that regulate primary conduct . . . and those that allocate losses after the tort occurs ... If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders. But if competing ‘postevent remedial rules’ are at stake other factors are taken into consideration, chiefly the parties’ domiciles” (Cooney v Osgood Mach., 81 NY2d 66, 72 [1993]).
It should also be patently obvious that the purpose of the laws in conflict here is not to regulate conduct, but rather to allocate loss (Bodea v TransNat Express, 286 AD2d 5, 9 [4th Dept 2001] [“(l)oss allocating laws are those that ‘prohibit, assign, or limit liability after the tort occurs’ ” (citations omitted)]). And in this context, when “conflicting laws relate to the allocation of losses, then considerations of the State’s admonitory interest [in ensuring appropriate standards of conduct in the future] and party reliance [on ‘the locus jurisdiction’s interests in protecting the reasonable expectations of the parties’] are less important” (Cunningham v Williams, 28 AD3d 1211, 1212 [4th Dept 2006] [emphasis added]).
Indisputably, the parties to this personal injury/wrongful death action do not presently share a common domicile. However, against the foregoing analytical backdrop, estate-plaintiffs principally rely on the first Neumeier rule urging the court to apply New York law because New York was Tedrick’s and C-P’s historic common domicile and locus of the tort. Alternatively, they argue that even where the parties are diverse domiciliaries as is factually the case at the time this action started, to date, the third Neumeier rule would similarly require the court to apply New York law and not the Damages Cap Law, viz., for purposes of this lawsuit, plaintiff is deemed to *170 be a New York domiciliary because New York is where she resided when she was injured inhaling the alleged asbestos-contaminated product defendant manufactured and sold.
At the outset, based upon Tedrick’s sworn description of her transitory, shared living arrangements when she' was based in New York, there is some uncertainty as to whether plaintiff was truly domiciled here during the 1969-1971 period. (See generally Matter of Bodfish v Gallman, 50 AD2d 457, 458 [3d Dept 1976] [“The test of intent with respect to a (purported new) domicile has been stated ‘as whether the place of habitation is the permanent home of a person, with the range of sentiment, feeling and permanent association with it’ ”].)
Even if plaintiff arguably was, in fact, a New York domiciliary during her stint as an American Airlines flight attendant based in New York, the second critical element to trigger either the first or third Neumeier rule is missing as New York was not the locus of the tort (place of injury). This factual/legal conclusion rests on the principle that “when the defendant’s negligent conduct occurs in one jurisdiction and the plaintiffs injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred” (Schultz, 65 NY2d at 195).
Notwithstanding the Schultz holding, estate-plaintiffs seemingly rely on the “first exposure” rule originating with Schmidt v Merchants Despatch Transp. Co. (270 NY 287 [1936]) and its progeny (e.g. Consorti v Owens-Coming Fiberglas Corp., 86 NY2d 449 [1995]; Blanco v American Tel. & Tel. Co., 90 NY2d 757 [1997]) to advance the notion that Tedrick’s injury did not occur several decades later on the fact-based date of onset of her illness and medical diagnosis of mesothelioma. Rather, estate-plaintiffs argue this rule compels a finding as a matter of law that plaintiffs injury occurred during the period 1969-1971 “upon [her cumulative] exposure to the toxic substance [asbestos], because it is at that point that there ha[d] been ‘a wrongful invasion of personal or property rights’ . . . [and] was based upon the assumption that a toxic substance acts immediately upon the body to produce injury” (Blanco, 90 NY2d at 772, quoting Schmidt, 270 NY at 300).
To be factually accurate, Tedrick was first exposed in Michigan, her birth state, when she started using the talc powder when she turned 12. And while not legally relevant in any New York action or relevant for purposes of this in limine motion (and putting aside the litigable issue of whether the product *171 actually contained asbestos fibers for another day),[13] no one will seriously dispute that due to Tedrick’s approximately 13 years of using the talc powder in Michigan, plaintiff would overwhelmingly satisfy the “frequency-regularity-proximity” test if need be in any jurisdiction that adopted a quantitative standard for specific causation.[14] Arguendo, given plaintiffs initial and primary use of the product in Michigan and applying either the first or third Neumeier rule, estate-plaintiffs’ “first exposure” rule argument would apparently require the court to apply Michigan’s Damages Cap Law, a position neither party takes. Moreover, based on plaintiffs own sworn testimony, New York was not even Tedrick’s place of last exposure to the product as she admitted sporadically using the talc powder in 1972 after she relocated from New York to California.
In any event, it appears estate-plaintiffs have substituted the verb “occur” with the verb “accrue” to find case law support for the proposition that the locus of Tedrick’s tort was in New York. However, the “first exposure” rule described in Blanco (supra), that estate-plaintiffs mistakenly rely on to establish the locus of the tort in New York, actually reflected judicial sensitivity to the notion that defendants should achieve repose as to “stale claims” particularly when the onset of disease from the toxic substance was delayed many years after an alleged exposure due to its latency.
Stated differently, this judicial rule was being applied to determine the accrual date of toxic tort claims for statute of limitations purposes and discernibly for no other purpose. Notably relevant to this discussion, the introductory portion of Judge Read’s scholarly dissenting opinion, infra (the substance of which the majority is in agreement), concisely explains that the “first exposure” rule the Court of Appeals formulated and applied in a long line of cases has been abrogated by CPLR 214-c (a legislatively enacted discovery rule for latent injuries from a toxic substance) and no longer has any legal significance:
“A latent disease is generally understood to be an illness that does not manifest clinically diagnosable symptoms until years after initial exposure to the disease-causing agent. . . And as we have recounted numerous times, the Legislature enacted CPLR 214-c to ‘overcome the effect of a line of Court of *172 Appeals decisions,’ beginning with Schmidt v Merchants Despatch Transp. Co. (270 NY 287 [1936]), which held that the claims of plaintiffs suffering from latent diseases ‘ accrue [d] upon “impact” or exposure even though the resulting illness [might not have been] manifested for a long time thereafter’ (Matter of New York County DES Litig., 89 NY2d 506, 513 [1997] [emphasis added]; see also Snyder v Town Insulation, 81 NY2d 429, 433 [1993] [noting that Schmidt and its progeny addressed the ‘question of how accrual should be determined when an injury was latent and went undiscovered until long after exposure’ (emphasis added)]; Consorti v Owens-Coming Fiberglas Corp., 86 NY2d 449, 454 [1995] [reviewing history of Court’s adherence to ‘the Schmidt rule fixing the occurrence of tortious injury as the date when the toxic substance invades or is introduced into the body’ (emphasis added)]). As a result of the Schmidt rule, the three-year statute of limitations in CPLR 214 (5) lapsed before these plaintiffs even became aware they were sick.
“To remedy this injustice, the Legislature adopted CPLR 214-c, which replaced the Schmidt rule in such cases with a rule of accrual keyed to ‘the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced’ (Matter of New York County DES Litig., 89 NY2d at 514).” (Giordano v Market Am., Inc., 15 NY3d 590, 602-603 [2010, Read, J., dissenting].)
What is legally significant in the choice of law context when applying the third Neumeier rule is that Tedrick’s place of injury was in Oregon where she was domiciled and where her disease process began:
“It seems clear that, where slowly developing personal injury claims such as this one are concerned, this ‘last event’ is the fact of plaintiff’s becoming ill. It is becoming ill that supplies the final element of a negligence or strict liability action and entitles plaintiff to sue. The ‘last event’ is not necessarily plaintiffs discovery of his illness; so to hold would be to confuse the beginning of plaintiff’s cause of action with the beginning of its end, i.e., with the starting of the statute of limitations. In support of looking to the time and place of illness rather than to discovery, Comment[ ] . . . 2 to § 377 *173 of the Restatement (First) of Conflict of Laws, explains the last event’ as follows: . . .
“ ‘2. Where a person causes another voluntarily to take a deleterious substance which takes effect within the body, the place of wrong is where the deleterious substance takes effect and not where it is administered.’[15]
“The illness/discovery distinction comports with the common sense and of the plain meaning of the phrase in question: ‘place of injury.’
“That this distinction is not explored in the cases is understandable, since there was no point to making such a distinction until New York’s 1986 switch to a discovery-based statute of limitations. NYCPLR § 214-c . . . But, now that the statute of limitations is discovery based, the difference between the events is apparent. I conclude that, when the legislature changed the time within which New Yorkers must sue, it did not address a different matter: the meaning of the conflict-of-laws phrases ‘last event’ and ‘place of injury.’ ” (In re Joint E. & S. Dist. Asbestos Litig., 721 F Supp 433, 435 [ED SD NY 1988] ;[16] Fusaro, 145 Misc 2d at 915 [“the word ‘injury’ in (CPLR 214-c [6]) (b) should be equated with the physical manifestation of the particular disease for which compensation is sought”]; 145 Misc 2d at 916 n 2.)
Based on the facts sui generis to this case, this court resolves this choice of law dispute by determining that it is Oregon which has the greatest outcome-interest in this litigation, particularly when it was in this state where plaintiff was domiciled for almost 17 years; where plaintiff unfortunately was stricken with mesothelioma; where plaintiff chose to die with dignity; where plaintiffs will was executed and probated; and *174 where estate-plaintiffs (one of whom is an Oregon domiciliary) must comply with their legal responsibilities inter alia to administer plaintiff’s estate and distribute its assets to Oregonian beneficiaries under the will (assets which would potentially include proceeds of any recovery in this action).
To be sure, the third Neumeier rule requires the court to apply the Damages Cap Law in this action, particularly when estate-plaintiffs have not demonstrated “ ‘that displacing that normally applicable rule [i.e., “law of the site of the tort”] will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants’ ” (Butler v Stagecoach Group, PLC, 72 AD3d 1581, 1584 [4th Dept 2010]).[17]
Finally, and as Butler (72 AD3d at 1585) makes clear, estate-plaintiffs have not met their burden of showing that a law limiting damages for nonpecuniary losses such as the Damages Cap Law is “truly obnoxious” and/or that it violates New York public policy. Moreover, even if this Oregon law does so, estate-plaintiffs have not “ ‘established that there are enough important contacts between the parties, the occurrence and the New York forum to implicate our public policy and thus preclude enforcement of the foreign law’ (Schultz, 65 NY2d at 202).” (Id.)
Accordingly, defendant’s in limine motion to apply Oregon Revised Statutes Annotated § 31.710, which would cap any potential noneconomic damages award at $500,000, is granted.

. The alleged facts are gleaned from plaintiff’s discovery deposition (EBT tr as exhibit B to Kramer opp aff) and videotaped deposition (VBT tr as exhibit A to Kramer opp aff) respectively taken on December 1 and 2, 2008.

. “Mesothelioma is a rare malignancy which attacks the membrane surrounding the lung . . . The latency period for mesothelioma is 30 to 35 years after exposure, but unlike asbestosis, mesothelioma may occur as a result of a short exposure to asbestos fibers. *165 Clinical features of the disease include severe chest pain, shortness of breath, weight loss and death which usually follows within two years of diagnosis.” (Fusaro v Porter-Hayden Co., 145 Misc 2d 911, 916 [Sup Ct, NY County 1989], affd 170 AD2d 239 [1st Dept 1991].)

. This invasive radical surgery involves the removal of cancerous pleural tissue and the affected lung closest to the malignant tumor(s).

. On October 27, 1997, Oregon “enacted the Death with Dignity Act which allows terminally-ill Oregonians to end their lives through the voluntary self-administration of lethal medications, expressly prescribed by a physician for that purpose.” (See Oregon Health Authority, Death with Dignity Act, available at http://www.oregon.gov/DHS/ph/pas/index.shtml.) For a patient to end his/her life under the ODWDA, he/she must be at least 18 years of age, an Oregon resident, mentally and physically capable of making and communicating his/her health care decisions and be suffering from a medically confirmed terminal illness with about a six-month life expectancy. An attending physician licensed to practice medicine in Oregon must determine whether a patient meets these statutory criteria. By affirming a 9th Circuit determination (Oregon v Ashcroft, 368 F3d 1118 [2004]) that an Oregon physician-assisted suicide due to the prescription of federally controlled substances was not a criminal act and does not run afoul of the 1970 Controlled Substances Act, the U.S. Supreme Court, for all intents and purposes, upheld the ODWDA (see Gonzales v Oregon, 546 US 243 [2006]).

. As cited, in relevant part, in an action for personal injury and/or wrongful death, Oregon Revised Statutes Annotated § 31.710 limits a potential damages award for noneconomic losses: “[I]n any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death . . . the amount awarded for noneconomic damages [e.g., ‘pain, mental suffering, emotional distress, . . . interference with normal and usual activities’ (Or Rev Stat Ann § 31.710 [2] [b])] shall not exceed $500,000.”

. See Vacco v Quill, 521 US 793, 796 n 1 (1997), inter alia, citing Penal Law § 125.15.

. See generally Fuller v Preis, 35 NY2d 425 (1974) (a jury must decide whether an “involuntary” suicide breaks the chain of causation from negligent conduct, resulting in injury and death); see also Watkins v Labiak, 282 AD2d 601, 602 (2d Dept 2001) (“the suicide [must be] a foreseeable consequence of the tortfeasor’s acts”).

. Oregon Revised Statutes Annotated § 127.890 (3) (“Liabilities”) states: “Nothing in ORS 127.800 to 127.897 limits further liability for civil damages resulting from other negligent conduct or intentional misconduct by any person.” (Emphasis added.)

. Parenthetically, Michigan also imposes a statutory cap for noneconomic losses in product liability cases (see Mich Comp Laws Ann § 600.2946a [1] [“Product liability actions; noneconomic damages ... In an action for product liability, the total amount of damages for noneconomic loss shall not exceed $280,000.00, unless the defect in the product caused either the person’s death or permanent loss of a vital bodily function, in which case the total amount of damages for noneconomic loss shall not exceed $500,000.00”]).

. As reiterated and amplified in C-P’s reply memorandum of law (at 7), the “last event necessary” for plaintiff to have a cognizable personal injury claim was the onset of her illness in Oregon and the “last event necessary” for the estate-plaintiffs “to have a ‘wrongful death’ claim, of course, was Ms. Tedrick’s death in Oregon.”

. In Neumeier v Kuehner (31 NY2d 121, 128 [1972]), the Court of Appeals formulated three rules which the Court concluded would be “profitably utilized [to] . . . uncover the underlying values and policies which are operative” when a court is confronted with a conflict of laws issue. These are the
*168 Neumeier rules understandably stated:
“Rule 1 provides that if the plaintiff and defendant share a common domicile, that state’s law should apply. Rule 2 provides that if the injury takes place in the defendant’s home state and that state’s law protects the defendant, or if the injury takes place in the plaintiff’s home state and that state’s law protects the plaintiff, then the law of the place of injury should apply. Finally, Rule 3 provides that in all cases not covered by Rules 1 or 2, the law of the place of the injury should apply unless different law ‘will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.’ ” (Aaron D. Twerski, A Sheep in Wolfs Clothing: Territorialism in the Guise of Interest Analysis in Cooney v. Osgood Machinery, Inc., 59 Brooklyn L Rev 1351, 1360 n 38 [1994].)

. New York Constitution, article I, § 16 states: “The right of action now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation.”

. See generally Slaughter v Southern Talc Co., 949 F2d 167 (5th Cir 1991).

. Lohrmann v Pittsburgh Coming Corp., 782 F2d 1156 (4th Cir 1986).

. Even without implicating any conflict of law issue, hut in a related vein, New York requires proof of injury to sustain a claim for emotional distress due to exposure to a toxic substance. (See Wolff v A-One Oil, 216 AD2d 291, 292 [2d Dept 1995] [“The ‘rational basis’ for . . . (plaintiffs) fear of contracting the disease . . . has been construed to mean . . . some indication of asbestos-induced disease (i.e., physical manifestation of asbestos contamination)”]; see similarly Cleary v Wallace Oil Co., Inc., 55 AD3d 773, 776 [2d Dept 2008] [physical manifestation of fuel oil contamination].)

. Parenthetically, this New York federal decision was recently cited with approval by the Supreme Court of Nevada in Wyeth v Rowatt (244 P3d 765, 776 [2010]) in personal injury/strict products liability actions involving hormone replacement therapy drugs.

. From a choice of law purist’s viewpoint, it could be argued that neither state has a significant outcome-interest on this loss allocation issue because: (1) C-P is not an Oregon corporate domiciliary for whom the Damages Cap Law was ostensibly designed to directly benefit; and (2) Oregon, not New York, was Tedrick’s place of injury. Nonetheless, this “unprovided for” case would still be covered by the third Neumeier rule.